Second case this morning, Khorrami v. Rolince. Mr. Heffman. May it please the court, the relevant issue in this case is whether the evidence is sufficient for a jury to find that Mr. Rolince committed perjury or was recklessly indifferent to the truth when he swore to his declaration, claiming that Mr. Khorrami had a connection to the 9-11 attacks. The evidence is that Mr. Rolince swore under penalty of perjury to the facts of the FBI's investigation into Khorrami, yet he knew nothing about that investigation. Mr. Rolince did not read any investigative reports about the investigation into Khorrami. He did not talk to anyone involved in the investigation into Khorrami, and he did not have knowledge of how the information was gathered for his declaration. Yet he stated in a sworn statement under penalty of perjury that he was privy to the details of that investigation, he described the factual status of the investigation, and he falsely claimed that Mr. Khorrami resided at the same apartment building as a 9-11 hijacker and that he attended the same flight training school as a 9-11 hijacker. Both of those claims were false, and the FBI knew they were false two months prior to Mr. Rolince's declaration because they had written extensive memos reported to the counterterrorism unit available in the FBI's files to Mr. Rolince stating that connection was false and disproven. Viewed in the light most favorable to Mr. Khorrami on this summary judgment review, a jury could certainly find that Mr. Rolince knowingly made a false statement about his knowledge or was reckless because he knew nothing about the status of the investigation, yet he swore to its status. Given that, this court should remand this case for a trial on the qualified immunity defense. How does your position fit with the Ziegler versus Abbasi Supreme Court? Your Honor, Ziegler is certainly very relevant here, a recent case, but it presents a different issue. In Ziegler, the court said the plaintiff is challenging a policy. They're challenging the hold until clear policy, and they sued the most senior officials in the government for that decision to adopt that policy. They sued the attorney general, the director of the FBI, and the director of the INS, and they said we're challenging your policy judgment that restrictive conditions for these particular aliens are necessary for security reasons. And that's why the Supreme Court said Bivens is not the place to challenge policies. The executive branch has discretion. If the legislature wants to change a policy, they'll change a policy. This case is very different. We are not challenging the hold until clear policy that the INS held aliens at the FBI's request. We are challenging an individual government actor who violated Mr. Karami's procedural due process rights by saying, I swear that these are the facts, when he didn't know the facts at all. And so this is not a case where the plaintiff, like the Supreme Court said in Ziegler, we Why did he adopt this level of restriction on these inmates? None of that occurred in the discovery in this case, because all of that was irrelevant. The discovery in this case didn't get into high-level policy judgments. It got into this issue. Mr. Rowlands, what did you know about the declaration when you signed it? I didn't know any of the facts. I just relied on other people. And then we went and deposed the other people, the people who actually talked to Mr. Karami, the people who actually read the memos, who said, we resolved this issue two months ago. I was surprised he was still in custody. So what Mr. Rowlands did wrong here, as opposed to the Ziegler case, is we are holding him accountable for his action, his declaration, which was false and which was recklessly done. There's another significant distinction with Ziegler here, and you can see in Ziegler they remanded for a special factors analysis for the people, the warden and the people who were running the jail. They treated those people differently based on their level, because we're not supposed to hold supervisors responsible for subordinates under Bivens. Nobody is seeking to hold Mr. Rowlands accountable for anything but what he individually did. And that's the purpose of Bivens. Bivens is focused on that individual constitutional overreach by a government actor, not challenging a policy. So in this case, we're not challenging a policy, we're challenging an individual action. Plus, there are not the, there is no alternative remedy here, and there are no special factors that mean this court should pause and not adopt a Bivens remedy. First of all, habeas does nothing for Mr. Karami to provide any compensation for him. As the Seventh Circuit held in Engel v. Buchan in a case involving a Brady violation, habeas can't un-ring the bell. It can't provide any compensation for the time unlawfully spent in jail. Mr. Karami spent time in jail because Mr. Rowlands falsely stated the FBI had interest in him. Can we talk about that? Go ahead. Was he definitely not appropriately held in custody? Because he was lawfully revoked his parole, and so doesn't that entail confinement or not? So your Honor, his parole was revoked, and so there was authority to detain him. But what the INS has testified to in this case is, absent the expression of FBI interest, he would have been released because he had an adjustment of status application pending, and unless the FBI said, this guy's a security threat, he's out. And that's why this is a procedural due process claim, as opposed to just unlawful detention, right? It is Mr. Rowlands' affidavit tainted the immigration proceeding, it tainted the parole decision, because it was false. And that's why this is distinct from a situation where just the FBI. False in the sense that he didn't go back and check with the agents that provided that information? Not exactly, Your Honor. False in the sense that he falsely stated what his knowledge was. He stated in paragraph three that he's personally involved in the investigation, and as such, he's privy to the details of the investigation. And then he says in paragraph 14 of his declaration, the FBI investigation indicates. And then he made the false statement about Mr. Karanth. And he declared that all under penalty of perjury. So Mr. Rowlands is saying to the court, as the lawyers who prepared this declaration admitted in their depositions, I know these things. And it is not our claim that Mr. Rowlands has to go out and do the investigation himself. He can acquire personal knowledge by talking to any of the agents. He could acquire personal knowledge by reading any documents. But the position taken by the Department of Justice here is Mr. Rowlands doesn't need to know anything about Mr. Karanth to sign this declaration. It's OK for him to sign it because he is sufficiently senior that anybody reading it would know. And that's a fact question for a jury to analyze when they hear him testify and assess his credibility. He was trying to tell the court, you can count on me. I'm authoritative. I'm the head of the counterterrorism division. And I know the details of the FBI investigation. That's what he wrote in his declaration. So it's not a failing on his part to do the investigation. It's a failing on his part not to be truthful about what he knew. And the line of cases that's discussed in the briefs, for example, USV Ventresca, USV Davis, those are instances where supervisory officers are saying, here's what I know. And here's what I don't know. I know certain things because I was involved in the investigation. On other things, I relied on my fellow agents. Mr. Rowlands didn't say that. Just like the officer in Davis, he said, I know these things. And sure, I don't think it's a reasonable inference that people would think Mr. Rowlands did every interview. But the reasonable inference is that he knew something. He talked to somebody. When we deposed Mr. Lang, one of the FBI attorneys in the case, he testified that when you have a national security case and headquarters is certifying a declaration, what the person who certifies that declaration does is they read the file. They talk to people involved in the investigation. That would be the normal course for a supervisor to inform themselves sufficiently. Otherwise, the declaration, the penalty of perjury, it doesn't really mean anything. He's not swearing to any knowledge. And if Mr. Rowlands had been candid in this declaration and honest and said, I don't actually know anything about the Karami investigation. But based on the declaration handed to me, this is the information. Well, that wouldn't have been worth anything from an evidentiary perspective. The only common thing that they had was this name, the Karami. I'm sorry, Your Honor. They were actually looking for a person named Karami, isn't that? No, Your Honor. That's also not correct? They weren't looking for a person named Karami. The confusion, which was resolved very quickly by September 18, 2001, there was a 9-11 terrorist named Waleed Mohammed Al-Sherry. He was one of the 9-11 hijackers. Early on in September of 2001, there was an identification of somebody named Waleed Ahmed Al-Sherry. And that person went to Embry-Riddle, a flight training school in Florida, where Mr. Karami was an instructor. And they lived in an apartment building near them. So by September 18, that's the connection. And so by September 18, it was public knowledge. It was in the BBC, which we've put in the record. It was in a BBC News article. Embry-Riddle put out a press release. We're so relieved that Waleed Ahmed Al-Sherry wasn't involved. He's been cleared. And all the memos from September 17, 2001, from Jacksonville FBI, Chicago FBI, say this connection is false. It's been resolved. Chicago FBI says we recommend Karami be removed from the watch list. Take him off the list. Recommend his release. Despite that, he is kept in custody for a sustained period of time because Mr. Rowlands submitted that declaration. Your Honor. You've said that twice. And obviously, that's an issue here, causation. If I recall correctly, was it Director Prettyman who testified, didn't matter what was in that declaration, as long as he didn't have a clearance letter from the FBI, INS was going to oppose release? He did testify to that, Your Honor. We have a couple responses on that causation point. First of all, there's a reason the INS went to the FBI in October of 2001 and said, we need this declaration, right? Now they're trying to say it's superfluous. They said they needed to keep him in custody. So who relied on it? Well, I think the district judge relied on it. No, no, no. I'm sorry, the immigration judge, Your Honor. It was never entered in the record, right? Well, it was presented to the judge at the November 14 hearing. As it was concluding, correct? As it was concluding. And the context of that was Mr. Firetag, the immigration attorney, said this proceeding is improperly closed. He is being held for no basis, and this is dragging on. His adjustment of status application, which would have freed him, should be resolved. And Mr. Fitter, the INS attorney, says, well, I have a declaration. I have a declaration from the FBI that says he is of a security interest. So the context in which he uses it, the context in which he presents it, is trying to keep him in custody. Well, but let's look more closely at that context, right? Nothing's going to happen on, this is November, what, 14th? 14th, Your Honor. Nothing's going to happen that day. They've concluded the proceeding. The immigration judge still sees your client is not eligible for a bond at that point. And by the time the next hearing rolls around, he's released, right? So it's a month later. Go ahead. The point I'd like to make, additional point, I didn't mean to interrupt you, Your Honor, is that had Rollins, instead of rubber stamping that declaration, had he said, give me the file. Give me the person on the line in Chicago. Let me know what's going on in the investigation. He would have learned what they learned in December when somebody looked at the files. So that sounds like you're arguing that the FBI had a constitutional duty to conclude this investigation sooner. No, Your Honor. The duty that Mr. Rollins had was to be truthful in his declaration. And our position is, if he had- So let me just ask you to consider this more prosaic hypothetical. Okay? A defendant is arrested on a relatively minor criminal charge, is being held. The police officer whispers to the prosecutor, we think this guy's a gang member and he's a suspect in a murder investigation. So we want you to oppose bond. But you can't tell what I just told you to the judge. And the prosecutor goes in and opposes bond. The false, let's say deliberately false information is never presented to the judge. Is that a constitutional violation? If he swore it under oath, it is a constitutional- The judge never hears it. Your Honor, I think it's still, in that case there's no perjury because it's not sworn under oath. Right? It's outside that context. Suppose he gives him an affidavit, the prosecutor tucks it into his pocket. If it's not presented to the court at all, which this declaration was, that may be a different situation. But this was presented, this process was tainted by that declaration. And the only other point I was, additional point I was making is, if Mr. Rowlands had not signed, before he signed this declaration, asked himself, what do I know? I need to know something if I'm going to swear to this under personal knowledge. The causal effect of that would have been a no interest letter. It would have been, I would have learned something. I would have learned what they did when anybody looked at the file. What happened in December of 2001 is somebody in Chicago FBI said, I'll look at the file. And what she did is she read the memos from September of 2001 and sent the same exact memo on December, in December of 2001 is that Chicago had already reported. And so the causal effect of Rowlands not executing this declaration would have been a no interest letter. And that would have led to parole, because that's exactly what happened. I see my time is up. If I could reserve a little. With regard to one more question, with regard to this business, doesn't that give the opportunity then for the judiciary to be inserted itself in all these decisions? When you say all these decisions, Your Honor, I'm sorry. Well, by an FBI, senior FBI official saying that what he said, what he said. No, Your Honor. The only time the judiciary gets involved is when somebody files a false affidavit, which hopefully is a. Well, yeah, but the way you find that out is to get the judiciary involved. Well, right. But rarely, Your Honor, I would submit would a plaintiff have sufficient factual basis to overcome qualified immunity in a complaint to say that there was a knowing falsehood. The reason we overcame qualified immunity is because the FBI admitted in a letter to the immigration court in December of 2001, we had this information in September of 2001. This declaration was false. So we had the benefit of that disclosure. And then we're able to find it. So this isn't a free license to get into the investigative decisions of the FBI. They want to rely on other agents. If they want to make those judgments, they're free to do so. But when somebody signs their name on the line that says under penalty of perjury, it has to mean something, that they know what they say they know. Thank you, Your Honor. Ms. Murphy? May it please the court and mostly for Mr. Rollins. Your Honors, I'd like to cover three areas. So I'm just going to tell you what they are. If you speak up, please. Sorry. I'd like to cover. That doesn't really help much. You just have to talk louder. I'd like to cover three areas. So I'd like to tell you what they are in case we lose track. And then I'll come back and argue them. First of all, I think that the Supreme Court's decision in Abbasi v. Ziegler is very, very clear and precludes any Bivens remedy here. Second, the district court was absolutely correct to find that no jury could find, based on the factual record, that Mr. Rollins either lied or acted with reckless disregard for the truth. And thirdly, as Your Honor has already pointed out, the declaration was, in fact, not used in the immigration proceedings. The district, the immigration judge, lacked jurisdiction to grant bond at that point. And Mr. Perryman made it very clear that the declaration would simply have told him something he already knew, which was that there was an investigative interest. So Your Honors, I'd like to actually start with the Abbasi case. It's very closely on point to this case. And the Supreme Court made absolutely clear that implying a Bivens remedy is, at this point, a disfavored judicial activity. It cut that significantly on when Bivens remedies should be available. And it provided a new test, really, for us to move forward with. First of all... Brady violations in ordinary prosecutions. So... Deliberate Brady violations. Your Honor, that's... I don't want to be cagey here, but that's the question that's not before the court, and I know that Your Honor's had a decision in... I'm asking you to interpret it. What the court said in Abbasi was, you have to look first to see if it's a new context. That would be a new context. Because the court told us, in Abbasi, that it's a new context unless the case is very similar to a case that the Supreme Court has already decided. So it has to look like Bivens or like Davis or like Carlson. And the Brady violation doesn't look like any of those. Beyond that, you have to do a very minute and intricate special factors analysis that would look at whether there were special factors cancelling hesitation. I know Your Honor's went through that analysis in Engle and concluded that the case could proceed. I would suggest that after Abbasi, it'll be the government's position that that will need a fresh look, and it will depend, because Abbasi was so careful about the specific claims raised and the specific factual circumstances, that it'll require an actual look at the specific case. So that's pretty much in a vacuum, pretty much all that I can say at this point. At a minimum, though, I think the court made it very clear that there's always going to be a new context. Let me ask you to consider a broader context, which is if Bivens remedies are to be confined, in essence, to the facts of Carlson, Bivens itself, and Davis, and if a president can use a pardon power to excuse government actors from criminal liability for violations of constitutional rights, what protections are in place for abuse of government power, deliberate abuse of government power? Well, the Supreme Court in Abbasi said that it's for Congress, rather than the judicial branch, to create damages remedies. Beyond that, I think in response to that, it's again going to depend on the facts. But in this particular context... So we have to rely on Congress to protect citizens from violations of their constitutional rights. In Abbasi, the Supreme Court held that that is a job for Congress and not for the judicial branch. I mean, obviously, there are other protections, and one of the things about Abbasi is it does look for alternative processes. And, for example, here, as I mentioned, the same special factors that were relevant in Abbasi are relevant here, and they include the same types of processes. For example, the availability of a habeas remedy. Which provides prospective relief, but no remedy. You would agree that your argument under Bivens would apply to deliberate falsification of evidence to hold somebody in custody? Yes. We would be making the same argument that it would be a new context and that you would have to look at the facts and determine... I am shocked that the United States government would take that position, but I understand it. Let me ask you if I could about... If I may. The Supreme Court held, it very clearly held, that there is not going to be a Bivens remedy unless Congress creates one. So it's not that the United States government is saying that people shouldn't have constitutional rights or be able to vindicate that. Do you think the Supreme Court went beyond the position advocated by the Solicitor General in the case? I'm not sure how to answer that question. The other point I'd like to make is that I am here representing Mr. Rollins, who is sued in his individual capacity for damages, and I believe that's one of the things that the court was very concerned about in Abbasi. Of course. Is that there are costs for individuals also. Can we talk about your second point, which is, in essence, how to interpret Mr. Rollins' affidavit? Yes, Your Honor. The phrase, from headquarters, privy to, is at least arguably intended to have a pretty dramatic effect as these affidavits are sent out to immigration courts and proceedings around the country. Now, we've read your briefs. My concern, though, is about how the arguments you're making fit in with the government's interest in other contexts where it's prosecuting people for perjury or for making false statements under Section 1001 in federal investigations. We recently had a case, for example, in which we affirmed convictions for false statements in an SF-86 background check form. And I'm wondering, given the arguments you're making in this case, how might this play out in a case where somebody signs an SF-86 that contains incorrect information about his background, leaves things out, and his explanation is, I signed without bothering to check the facts, or I forgot, or I relied on others. You seem to be saying that, as a matter of law, that can't be perjury. Your Honor, that doesn't follow in the slightest. Explain the difference to me. Right. So it's very important in this context to understand the context in which the declarations were set up. If you look in your record at Supplemental Appendix A87, what happened was there was a big investigation into the bombings and the terrorist attacks. There wasn't a separate investigation into Karame. As a policy matter, the way that the Department of Justice decided to implement the hold until clear policy was that they would send out to all of the FBI offices, that's the one at 87, and each office, each detainee would be assigned to be the specific charge of an FBI office who was charged with going and getting all the most information, all the most recent information, doing a report. That was reported back to the working group in a file. The working group took the file, summarized it, and you can compare the report from Milwaukee, which is at B92, with the actual declaration. It summarizes what's in the file, which represents the FBI's most recent thinking, and somebody, not Mr. Rollins, determined that the way that these things would move forward would be that the working groups would draft the declaration based on the information, which was the information that was the FBI's most recent information, and then take it to Mr. Rollins. It was partial, correct? I understand. Look, mistakes were made. I get that, but I'm trying to understand how any of that differentiates the person who says, I forgot or I relied on information from others in providing false information in an SF-86 under similar penalty of perjury. So in your SF-86, it's all about you. So if I sign my SF-86 and it says I went to high school at wherever I went, I'm supposed to know that. So it's a true fact. Suppose you're relying. There are situations where people are relying on others to help prepare those documents. I forgot. But Rollins was entitled to rely in a way that people may be, and perhaps if you have an agent who's filling this out for you, perhaps obviously you have a duty of swearing to it. He had a duty. He understood the way that the system was set up. Let me shift. Okay, you don't like the SF-86. How about the financial disclosures that people with senior positions in the federal government have to file every year? A lot of people have accountants help them prepare those. But again, it's things within your own knowledge. Mr. Rollins claims that the declaration... I relied on my accountant. Right. Your Honor, the declaration does not say, I, Michael Rollins, know these things. It said, I'm privy to these details of the investigation. As I just explained, when he gets the declaration, he knows because he understands the way that as a matter of policy they're going to have these declarations drafted, he's going to sign them. And there's testimony that he read them carefully, so that by the time he's read the declaration, he knows all the facts that the FBI knows. You know that's not correct. That's an exaggeration, right? Because you know that the Milwaukee report did not include the information from Chicago and Jacksonville from two months earlier, right? That's correct, but from Mr. Rollins' point of view, and he's supposed to be held liable in damages for perjury or reckless disregard of the truth. This is why it's important. A mistake was made. I understand that, and the FBI regrets it very much, I must say. The mistake occurred in Milwaukee. It is not Mr. Rollins who made the mistake. And as the district court said, given that he's running the counterterrorism attack, he's got 96 FBI officers. If there's a problem with this, the problem is that it was set up for Mr. Rollins' signature, for somebody so senior that he would be reading the declaration and trying to understand whether the FBI still had an interest. That's not Mr. Rollins' problem. Mr. Rollins believed the things to be true. He believed that the system was set up to weed out falsehood. And as the district court pointed out, you need to have some kind of culpable intent. So in a criminal prosecution, if we can't prove that there's knowing falsehood, then the prosecution fails, Your Honor. I can imagine a passionate argument to the jury along the lines you've just made on behalf of this official who submits a false financial declaration. I forgot. I relied on my accountant. Now, that may be a jury issue. I don't see how it's a summary judgment issue. But, Your Honor, here it's a summary judgment issue because of three things. First of all, in the declaration, all he says is completely true and honest things. I'm in a senior position. I know about the general contours and details from the investigation. The FBI knows this. The FBI knows the other thing. The details of the investigation are we haven't been able to rule out Karami as a suspect. There were mistakes in the declaration. But from Michael Rollins' perspective, as the district court held after going through these mountains of evidence, that Michael Rollins definitely did not commit perjury and he did not exhibit reckless disregard for the truth. He wasn't in a position to double-check everything and he didn't believe he had to because his experience in 31 years at the agency was that in something as important as this, by the time he got the information, it would be truthful. And I acknowledge that a mistake was made. But it was not Michael Rollins' mistake. And to the extent that it has to do with the way that the whole system was set up so that a very senior person would be signing the declarations and wouldn't be reviewing files, that's really a policy decision that, again, is... Thinking there was no possibility of a mistake? He says in his deposition, he says, human beings are preparing these things. Of course there's a theoretical possibility of a mistake. But he's an FBI agent. He has standards. He really... He believes that there was not any particular mistake in anything that was given to him. And we cited the pages of the testimony in his brief, in our brief, Your Honour. And I think the district court was absolutely correct to find that summary judgment was correct because the important element of knowing falsity or deliberate indifference is just missing here. He did not... He did not tell a lie and he did not recklessly disregard the truth. He really, honestly, sincerely believed that what he was saying was true and he had a good basis and he knew of the basis for saying that. I see my time's up. Thank you, Ms Murphy. Any time left for...? You're out of time. Thanks to both counsel. The case will be taken under advisement. And we move to the third case this morning.